1
2
3
4
5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7
8
9

10   FREDERICK SCHIFF,

11          Plaintiff,                          No. C 10-1051 PJH

12      v.                                      **ORDER GRANTING DEFENDANT'S
                                                MOTION FOR SUMMARY JUDGMENT**
13   TERESA BARRETT, et al.,                    **AND DENYING PLAINTIFF'S MOTION
                                                FOR SUMMARY JUDGMENT**
14          Defendants.
     _____/

15

16          The parties' motions for summary judgment came on for hearing before this court on

17   June 29, 2011.  Plaintiff appeared by his counsel Tom Bourke, and defendant appeared by

18   its counsel Lauren Monson.  Having read the parties' papers and carefully considered their

19   arguments and the relevant legal authority, and good cause appearing, the court hereby

20   GRANTS defendant's motion and DENIES plaintiff's motion.

21                              **BACKGROUND**

22          Plaintiff Frederick Schiff ("Schiff") is a white male, employed for more than twenty-

23   five years by the San Francisco Police Department ("SFPD"), part of defendant City and

24   County of San Francisco ("the City").  Schiff, a Sergeant, has taken a number of Lieutenant

25   promotional examinations offered by the City.  Each examination resulted in the creation of

26   an "eligible list," in which candidates were ranked according to their scores.  Schiff has

27   never been selected for promotion to the rank of Lieutenant.  He claims that this is because

28   the City discriminates against white candidates in the hiring and promotion of police

**United States District Court**
For the Northern District of California

1   officers, and also because he has previously complained about such discrimination.

2       The Rules of the San Francisco Civil Service Commission ("CSC") set forth the

3   process for making entry level and promotional appointments in the City.  Except for certain

4   positions that are exempted from the appointment and removal process, all City employees

5   must be appointed through a competitive examination process.  An eligible list ranking

6   promotional candidates is generated based on the results of such examinations, and an

7   appointing officer then uses the eligible list to make appointments to a civil service

8   classification.

9       In 2003, Schiff filed suit against the City in San Francisco Superior Court, and the

10  case was removed to this court as Schiff v. City and County of San Francisco, C-03-4345

11  ("Schiff I").  The basis of Schiff's complaint was "reverse discrimination" against white

12  officers, in connection with promotions made from the 1993 and 1999 Lieutenant eligible

13  lists.

14      In Schiff I, Schiff alleged claims under both state and federal law, asserting, among

15  other things, that former Chiefs of Police Fred Lau and Alex Fagan, Sr., and then-Assistant

16  Chief Heather Fong, had violated his rights to equal protection of the laws and to be free

17  from racial discrimination.  In March 2006, Schiff and other plaintiffs in two related cases

18  settled with the City in exchange for receipt of monetary compensation and a release of any

19  and all claims (known or unknown) through the settlement date.

20      In January 2008, the SFPD assigned newly-promoted Captain Teresa Barrett to

21  Park Station.  This was Captain Barrett's first assignment as the commanding officer of a

22  District Station.  Schiff claims that upon taking command of Park Station, Captain Barrett

23  began to create a hostile work environment for him.

24      Captain Barrett testified that soon after she assumed command of Park Station, she

25  took Schiff to a community meeting in the Western Addition.  She claimed that while she

26  was explaining Park Station's mission, Schiff interrupted, saying, "No, Captain that is

27  wrong, that is not how we do things."  Captain Barrett testified that upon returning to the

28  station, she verbally counseled Schiff for inappropriate and insubordinate conduct.  From

**United States District Court**
For the Northern District of California

2

United States District Court

For the Northern District of California

1   that point forward, according to defendants, Schiff repeatedly challenged Captain Barrett's

2   orders and directives.

3        Park Station is responsible for patrolling portions of the Western Addition, including

4   areas with concentrated gang activity.  According to Captain Barrett, the station works

5   closely with the community to help reduce violent crime and help residents feel safe.  A

6   violent street gang known as the "Knock Out Posse" (or "KOP") operates in the Western

7   Addition and is subject to a 2007 Civil Gang Injunction.  Deputy Chief Kevin Cashman

8   testified in his deposition that during the latter part of 2008, he was informed that federal

9   authorities were investigating Western Addition gangs, that many gang members would be

10  arrested, and that individuals who were considered "snitches" by gang members would be

11  in danger.

12       Schiff had a personal relationship with Linda Yoakum, a resident of the Western

13  Addition.  Schiff frequently spent time at Ms. Yoakum's home and took her children on

14  outings with his own children.  Schiff was a known police officer in the community and to

15  local gang members, including members of the KOP gang.  Ms. Yoakum worried that local

16  gangs would view her son "M" as a snitch based on Schiff's relationship with her and the

17  amount of time he spent at her home.  Ms. Yoakum went so far as to arrange for Schiff to

18  meet M away from the house when going on outings.

19       According to testimony by Ms. Yoakum at a Police Commission hearing, a KOP

20  gang member threatened her on September 19, 2008, stating "You know what happens to

21  people that work with the police, the community is talking about you."  Ms. Yoakum

22  understood this to be a threat of gang reprisal, and informed Schiff of the threat the next

23  morning, as he picked up her children for a weekend outing in the Sacramento Delta.

24       Nevertheless, Schiff failed to report this incident to his superior officers, which was a

25  violation of SFPD policy.  He did not file a police report, or otherwise follow up to ensure

26  that Ms. Yoakum had appropriate police protection during the weekend.  Schiff stated that

27  he "did not feel it needed to be done" and that he did not want to have to answer to Captain

28  Barrett regarding the situation, although he conceded that had his prior Captain (Captain

United States District Court

For the Northern District of California

1   John Erlich), still been at Park Station, he "absolutely" would have reported the incident to

2   him, even if Ms. Yoakum had already done so.

3        Captain Barrett directed Schiff to write a memo explaining why he failed to take

4   proper action, and issued him a counseling.  Chief Fong and Deputy Chief Cashman

5   testified that on September 25, 2008, to ensure the safety of Ms. Yoakum's family, the

6   Department issued a stay-away order to Schiff, instructing him not to visit the Yoakum

7   residence.  The order was signed by Deputy Chief Cashman.

8        Schiff regarded these actions as unwarranted, and, according to defendants, he then

9   stepped up his challenges to Captain Barrett's authority.  Captain Barrett testified that in

10  early September 2008, she learned that Schiff was inappropriately challenging her

11  qualifications and leadership to other officers, and that she subsequently learned that Schiff

12  was also  discrediting her to a member of the San Francisco Board of Supervisors.

13       On each of these occasions, defendants contend, Captain Barrett reported Schiff's

14  conduct through the chain of command and asked that he be transferred.  Captain Barrett

15  was instructed to counsel Schiff and document her concerns about his behavior, although

16  her requests to transfer him were refused.

17       On October 6, 2008, Schiff filed a second suit against the City, and also against the

18  SFPD and Chief of Police Heather Fong,[1] Schiff v. City and County of San Francisco,

19  C-08-4627 ("Schiff II"), alleging claims of racial discrimination, retaliation, and harassment,

20  under 42 U.S.C. § 1981; 42 U.S.C. § 1983; Title VII of the 1964 Civil Rights Act ("Title VII"),

21  42 U.S.C. § 2000e, et seq.; and the California Fair Employment and Housing Act ("FEHA"),

22  Cal. Govt. Code § 12940(h).  The claims in Schiff II spanned the period from the signing of

23  the March 2006 release in connection with the settlement in Schiff I, to October 6, 2008,

24  and involved the City's failure to promote Schiff to the position of Lieutenant from the 2005

25  Lieutenant eligible list (which expired on October 2, 2008).  The Schiff II case is the subject

26  of an order filed concurrently with this order, regarding the parties' motions for summary

27  ────────────────────

28       [1]  Chief Fong became acting Chief of the SFPD in January 2004, and received a
     permanent appointment as Chief in April 2004.

4

United States District Court

For the Northern District of California

1  judgment in that case.

2      In January 2009, Lieutenant Ernie Fernando of the Gang Task Force Unit contacted

3  Captain Barrett to inform her that Schiff was knocking on doors seeking a wanted individual

4  the Gang Task Force was pursuing.  When Lieutenant Fernando reported that Schiff's

5  actions were compromising the Gang Unit's investigation, Captain Barrett contacted Schiff

6  and directed him to draft a memo explaining his conduct.  Schiff received no discipline for

7  this incident.

8      In late April or early May 2009, Lieutenant Fabbri contacted Captain Barrett to

9  question the sufficiency of a counseling session and memo that Schiff administered to a

10  subordinate while serving as acting Lieutenant.  Captain Barrett testified that after

11  reviewing the memo, she concluded that it was not up to Department standards, directed

12  Schiff to rewrite the memo and counseled him regarding the proper procedure for

13  counseling of subordinate officers.  Schiff received no discipline for this incident.

14      In September 2009, Captain Barrett reported that Schiff had again engaged in

15  insubordination, while serving as an Acting Lieutenant.  The Field Operations Bureau had

16  canceled posted overtime, but the officers signed up for overtime were not informed and

17  showed up to work.  Captain Barrett directed Schiff to allow the officers to work

18  compensatory time, if they chose, but not overtime, since it had not been approved by Field

19  Operations.  She testified that Schiff argued with her, but then informed her that he was

20  giving the officers overtime.  Captain Barrett reported this insubordination up the chain of

21  command.  Schiff received no discipline for this incident.

22      Meanwhile, because of the threat made to Ms. Yoakum and Schiff's failure to act,

23  the SFPD instigated a disciplinary complaint and investigation.  Following the investigation

24  by the SFPD's Management Control Division, the SFPD filed disciplinary charges.  Chief

25  George Gascón (who had replaced Chief Fong as Chief of Police on August 8, 2009)

26  reviewed the charges and recommended in August 2009 that Schiff be disciplined for

27  Neglect of Duty.

28      The basis for the discipline was Schiff's violation of Rules 2, 5 and 26 of Department

United States District Court
For the Northern District of California

General Order 2.01 of the SFPD:

> OFF DUTY RESPONSIBILITY. While off duty, officers shall take all reasonable steps to prevent crime, detect and arrest offenders, and protect life and property, consistent with their ability to take proper action.
>
> PERFORMING DUTIES. Members shall perform their duties promptly and according to department policies and procedures.
>
> OFF DUTY REPORTING. Officers shall, when off duty, report any serious crime or urgent police matter brought to their attention.  Officers shall report any incident in which they become involved as a peace officer.

The original recommendation was for a five-day suspension.  Chief Gascón reduced the recommended discipline to a three-day suspension held in abeyance.  After the Chief's Hearing, which was held on September 15, 2009, Deputy Chief Shinn further reduced the recommended discipline to a one-day suspension held in abeyance for three years and a transfer to another station.  Chief Gascón concurred with the findings.

Schiff appealed Chief Gascón's recommendation to the Police Commission, and was provided a full evidentiary hearing on November 4, 2009, and December 2, 2009, at which time he presented evidence and cross-examined witnesses.  Following the hearing, the Commission upheld the recommendation for a one-day suspension held in abeyance and transfer to Southern Station.  On December 17, 2009, Chief Gascón notified Schiff of his recommendation for the disciplinary suspension and transfer.

Schiff did not seek a writ of administrative mandamus challenging the Police Commission's ruling, as required under California Code of Civil Procedure § 1084, et seq. Instead, he filed the present action against the City, the Police Commission, and the Police Commissioners.  The Commissioners and the Police Commission were dismissed from the case, on the basis that any claim involving the Police Commission hearing was barred by Schiff's failure to comply with state law by seeking a writ of mandate after the decision.

In December 2009, the Department transferred Schiff from Park to Southern Station. In June 2010, per his request, Schiff was transferred to the motorcycle Honda Unit of the Tactical Division.

Schiff made an internal complaint of race discrimination and retaliation in November

United States District Court
For the Northern District of California

1   or December 2008, over a month after he filed the Schiff II lawsuit.  He did not file a formal

2   complaint of discrimination with the City's EEO unit until April 2009.  That complaint was his

3   only complaint of discrimination, retaliation or harassment other than the complaints he has

4   filed with this court.

5        EEO Programs Senior Specialist Svetlana Vaksberg investigated Schiff's internal

6   complaints, interviewing him in October 2008, March 2009, and April 2009, and then

7   drafting a charge that Schiff signed in April 2009.   Ms. Vaksberg investigated the

8   promotions from the 2005 Lieutenant eligible list and Schiff's like-work-like-pay assignment.

9   She evaluated Schiff's complaints to determine whether they met the threshold of

10  discrimination, retaliation or harassment so as to trigger a formal investigation, and met

11  with Schiff to review and revise his charge of discrimination.  Schiff reviewed the Charge of

12  Discrimination, did not make changes, and signed it on April 16, 2009.

13       Ms. Vaksberg interviewed numerous witnesses, including witnesses identified by

14  Schiff.  She forwarded her report to Human Resources Director Micki Callahan, who

15  determined that the discrimination and retaliation claims were unsubstantiated.   Ms.

16  Callahan notified Schiff of the City's determination by letter dated June 30, 2010. On the

17  same date, Ms. Vaksberg held a closure meeting with Schiff.  Schiff did not appeal the

18  no-cause determination to the CSC.

19       Schiff participated in the 2008 promotional exam for Lieutenant.  On January 21,

20  2009, the City adopted a new Lieutenant eligible list, based on the results of the

21  examination given in 2008.  The certification rule for this list is the Rule of Five Scores.[2]

22  Schiff was rank 12 on this list.  However, because rank 8 included two candidates and rank

23  10 also included two candidates, there were 13 candidates who scored higher than Schiff.

24

25

26        [2]  Under the Rule of Five Scores, the Human Resources Department certifies" to the
27  appointing officer the names of eligibles with the five (5) highest scores on the list of eligibles
    for the position who are available for appointment. . . . An eligible list adopted under the Rule
28  of Five Scores shall in all cases be exhausted when eligibles standing at less than three (3)
    scores are available."  S.F. Civ. Serv. Com. R. 213.3.3.

United States District Court

For the Northern District of California

1   Chief George Gascón[3] made three rounds of promotions from the 2009 Lieutenant eligible

2   list, in November 2009, July 2010, and November 2010.

3        Chief Gascón testified that he promoted officers from the 2009 eligible list in rank

4   order, unless an officer had pending or recent discipline.  He had a committee review the

5   secondary criteria, and make promotional recommendations to him, based on eligibility and

6   lack of recent or pending discipline.  When reviewing recent discipline, he considered the

7   proximity in time and the seriousness of the underlying incident.  He did not consider

8   medals of valor, nor did he personally review resumes or personnel files of eligible

9   candidates.

10       On November 14, 2009, Chief Gascón promoted ranks 1 through 5 in rank order.

11  He made a second round of promotions on July 24, 2010, promoting the next twelve

12  candidates in order, skipping only two (Schiff and one other), because of disciplinary

13  issues.  The other candidate had a disciplinary issue pending with the Police Commission,

14  while Schiff had been disciplined less than eight months earlier for neglect of duty.

15       On November 6, 2010, Chief Gascón made a third round of promotions, in rank

16  order, skipping only one candidate due to recent disciplinary issues.  Other than the

17  skipped candidates, Chief Gascón made the appointments in rank order.  None of the

18  candidates that were appointed had recent disciplinary issues.

19       One of the officers Chief Gascón promoted in July 2010 was Thomas Feledy, who

20  was rank 11 on the 2009 Lieutenant eligible list, and who had been a plaintiff in the Schiff I

21  lawsuit.  One of the officers Chief Gascón promoted in November 2010, Gregory Mar, was

22  rank 27 on the 2009 list, and had also been a plaintiff in the Schiff I lawsuit.  In addition, in

23  June 2010, Chief Gascón promoted another Schiff I plaintiff – Lt. Donna Meixner – to

24  Captain, and in July 2010, he promoted Joseph Engler to Lieutenant.  Engler had sued the

25  City in the San Francisco Superior Court.

26       Schiff claims that the City's reasons for not promoting him were discriminatory and

27  _____

28       [3] Chief Fong retired from the SFPD on August 7, 2009, and was replaced by Chief
    Gascón on August 8, 2009.

United States District Court

For the Northern District of California

1  retaliatory, but his main complaint appears to involve the discipline imposed on him in

2  connection with his failure to promptly notify Chief Barrett of the gang threat reported by

3  Ms. Yoakum in September 2008.  He claims that Captain Barrett lied in her testimony

4  before the Police Commission, and also lied in her deposition taken in this case.  He

5  appears to be asserting that the improper imposition of discipline was in retaliation for his

6  having opposed racial discrimination.  By challenging the validity of the discipline, his intent

7  appears to be to challenge his non-promotion to Lieutenant from the 2009 list.

8      Schiff filed the present action (Schiff III) on March 11, 2010, against the City, the

9  San Francisco Police Commission, individual members of the San Francisco Police

10  Commission, and Captain Barrett, alleging post-October 6, 2008 racial discrimination,

11  harassment, and retaliation, under 42 U.S.C. §§ 1981 and  1983.  Schiff challenges

12  Captain Barrett's management, and asserts that she harassed him and that she and the

13  City retaliated against him for his prior activity in opposing racial discrimination.

14      In the third amended complaint, Schiff asserts two causes of action – a claim under

15  § 1981, alleging discrimination, retaliation, and harassment; and a claim under § 1983,

16  alleging discrimination in violation of the Equal Protection Clause.  The City is the sole

17  remaining defendant in the case.  The court previously granted defendants' motions to

18  dismiss the Police Commission, the individual Police Commissioners, and Captain Barrett.

19                              **DISCUSSION**

20  A.    Legal Standard

21      A party may move for summary judgment on a "claim or defense" or "part of . . . a

22  claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is

23  no genuine dispute as to any material fact and the moving party is entitled to judgment as a

24  matter of law.  Id.

25      A party seeking summary judgment bears the initial burden of informing the court of

26  the basis for its motion, and of identifying those portions of the pleadings and discovery

27  responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

28  v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome

United States District Court

For the Northern District of California

1   of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a

2   material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

3   verdict for the nonmoving party.  Id.

4        The moving party initially bears the burden of proving the absence of a genuine

5   issue of material fact.  Celotex, 477 U.S. at 323.  Where the non-moving party bears the

6   burden of proof at trial, the moving party need only prove that there is an absence of

7   evidence to support the non-moving party's case.  Id. at 325.  Where the moving party

8   meets that burden, the burden then shifts to the non-moving party to designate specific

9   facts demonstrating the existence of genuine issues for trial.  Id. at 324; see also Fed. R.

10  Civ. P. 56(c), (e).  This burden is not a light one.  The non-moving party must show more

11  than the mere existence of a scintilla of evidence, Anderson, 477 U.S. at 252, or that there

12  is some "metaphysical doubt" as to the material facts at issue, Matsushita Elec. Indus. Co.,

13  Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In fact, the non-moving party must

14  come forth with evidence from which a jury could reasonably render a verdict in the

15  non-moving party's favor.  Anderson, 477 U.S. at 252.

16       When deciding a summary judgment motion, a court must view the evidence in the

17  light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

18  Anderson, 477 U.S. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

19  B.   The Motions

20       The City seeks summary judgment as to both causes of action.  Schiff does not

21  oppose the motion as to the harassment claim, and provides no evidence in support.

22  Accordingly, the motion is GRANTED as to that claim.  Thus, the claims remaining are the

23  claims of discrimination under §§ 1981 and 1983, and the claim of retaliation under § 1981.

24       Schiff seeks partial summary judgment.  He seeks a ruling that Captain Barrett lied

25  in her testimony before the Police Commission, and he seeks summary judgment as to all

26  of the City's affirmative defenses.

27       1.   Monell claims

28       The City contends that the claims asserted against it fail because Schiff cannot

10

1   establish liability as required under Monell v. Dep't of Social Services, 436 U.S. 658, 691

2   (1978).

3        Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where

4   official policy or custom causes a constitutional tort.  See Monell, 436 U.S. at 690.

5   However, a city or county may not be held vicariously liable for the unconstitutional acts of

6   its employees under the theory of respondeat superior.  Board of Cty. Comm'rs. of Bryan

7   Cty. v. Brown, 520 U.S. 397, 403 (1997); Monell, 436 U.S. at 691; see also Federation of

8   African Am. Contractors v. Oakland, 96 F.3d 1204, 1215 (9th Cir. 1996) (applying Monell

9   analysis to suit under § 1981).

10       Liability may not be imposed against a municipality for claimed violations of

11  constitutional rights unless deliberate action attributable to the municipality itself is the

12  moving force behind the alleged deprivation of constitutional rights.  Bryan County, 520

13  U.S. at 400.  That is, the plaintiff must show not only that he suffered a constitutional

14  violation at the hands of a municipal employee, but must also show that an act of the

15  municipality itself, taken with deliberate indifference to known or obvious consequences, led

16  the employee to deprive the plaintiff of his constitutional rights.  Id.

17       The action inflicting the injury must flow from an explicitly adopted or a tacitly

18  authorized municipal policy.  "Official municipal policy includes the decisions of a

19  government's lawmakers, the acts of its policymaking officials, and practices so persistent

20  and widespread as to practically have the force of law."  Connick v. Thompson, 131 S.Ct.

21  1350, 1359 (2011).

22       In order to establish an official policy or custom sufficient for Monell liability, a

23  plaintiff must show a violation resulting from an employee acting pursuant to an expressly

24  adopted official policy, an employee acting pursuant to a long-standing practice, or an

25  employee acting as a "final policymaker."  Delia v. City of Rialto, 621 F.3d 1069, 1081-82

26  (9th Cir. 2010); see also Plumeau v. School Dist. No. 40 County of Yamhill, 130 F.3d 432,

27  438 (9th Cir. 1997); Federation of African Am. Contrs., 96 F.3d at 1214-15.  The City

28  contends that Schiff cannot establish Monell liability in any of these ways.

United States District Court

For the Northern District of California

1    First, the City contends that Schiff cannot show that the actions about which he

2 complains – his non-promotion to the rank of Lieutenant, and Chief Gascón's refusal to

3 accede to Schiff's request that the stay-away order be lifted – were taken pursuant to any

4 longstanding, unlawful, City custom or practice.

5    In response, Schiff asserts that the City is liable because of its long history, practice,

6 usage, and unwritten policy of discriminating against non-black officers.  He contends that

7 under the Officers for Justice consent decree, which was in effect from 1979 to 1998, the

8 City implemented "banding" as a "tool to deal with adverse impact" towards black officers

9 taking the City's promotional examinations.[4]  Thus, he asserts, the municipal "policy" is the

10 _____

11    [4]  Thirty-eight years ago, in 1973, a group of black, Latino, Asian, and female police
officers, and Officers for Justice, an organization representing minority officers, sued the City

12 and the SFPD in federal court, alleging discrimination in hiring and promoting, and seeking to
integrate the SFPD with female and minority-race officers.  See Officers for Justice v. San

13 Francisco Civil Service Commission, C-73-0657 (N.D. Cal.).  In 1977, the United States filed
its own action against the City arising out of the same allegations.  See United States of

14 America v. City and County of San Francisco, C-77-2884 (N.D. Cal.).

15    The cases were consolidated, and the litigation was eventually settled by consent
decree in 1979.  See Officers for Justice v. Civil Serv. Comm'n, 473 F.Supp. 801 (N.D. Cal.

16 1979).  The consent decree was signed by the City, the U.S. Department of Justice, Officers
for Justice, and the San Francisco Police Officers Association (which had intervened).  One

17 plaintiff appealed, which necessitated review of the consent decree by the Ninth Circuit.  In an
order issued approximately two years later, the Ninth Circuit affirmed the district court's order

18 validating and approving the consent decree.  See Officers for Justice v. Civil Serv. Comm'n,
688 F.2d 615 (9th Cir. 1982).

19    The consent decree provided for termination after ten years, but in 1986 the district

20 court extended some of its provisions beyond the 1989 date, because many of the promotions
required under the consent decree had still not been made.  The court ruled that certain

21 provisions would continue until the City moved for termination.  The Ninth Circuit upheld the
extension.  See Officers for Justice v. Civil Serv. Comm'n, 934 F.2d 1092 (9th Cir. 1991).

22    In 1991, the San Francisco Police Officers Association, which had intervened in the

23 Officers for Justice litigation, appealed a decision by the district court declaring "banding" to
be a legally valid scoring procedure for promotion examinations to certain ranks in the SFPD.

24 The court's decision allowed the City to treat scores that fell within a statistically derived "band"
a statistically equivalent for purposes of evaluating the knowledge, skills, and abilities

25 measured by a particular examination. The City sought to band some test scores as a method
of complying with the 1979 consent decree, and to use race, professional conduct, education,

26 training, and experience as criteria to be used in selecting candidates for promotion from within
the band.  The Ninth Circuit affirmed the use of banding and the proposed selection criteria.

27 See Officers for Justice v. Civil Serv. Comm'n, 979 F.2d 721 (9th Cir. 1992).

28    In October 1998, the district court terminated the consent decree pursuant to stipulation
(although additional litigation ensued).  See Officers for Justice v. Civil Serv. Comm'n, 2009

12

United States District Court

For the Northern District of California

1  City's use of "banding," for the purpose of enlarging "the number of black officers who

2  would be eligible to be promoted."  He contends that once the black officers were in the

3  band, they would always get promoted.

4      Schiff asserts that these promotions were the "genesis" of the <u>Schiff I</u> case, that the

5  use of banding was responsible for his being passed over for promotion from the 2005

6  Lieutenant eligible list in favor of two black Sergeants whom he claims were less qualified,

7  and that this "policy" also led to his non-selection for promotion from the 2009 Lieutenant

8  eligible list.  He contends that one of the officers who was promoted from the 2009 list had

9  two DUI convictions, and that this indicates that Chief Gascón was not considering recent

10  discipline when he made the promotional decisions.  He does not identify any "policy" that

11  led to the issuance of the stay-away order.

12      Second, the City argues that Schiff cannot point to any constitutional tort caused by

13  a person with final policymaking authority.  The City contends that the CSC is the final

14  policymaker with respect to employment matters in San Francisco, and that Schiff has not

15  identified any specific policy of the City or the CSC that caused his alleged injuries, but

16  rather asserts only that personnel actions specific to his own employment establish the

17  City's liability.

18      In response, Schiff asserts that the Chief of Police has final policymaking authority

19  regarding employment matters, based on the provisions of California Government Code

20  § 38630(a) ("[t]he police department of a city is under the control of the chief of police");

21  and the San Francisco Administrative Code § 2A.30 ("[e]ach department head shall be

22  immediately responsible for the administration of his or her department; . . . "[t]he

23  department head shall act as the 'appointing officer' under the civil service provisions of the

24  Charter for the appointing, disciplining and removal of such officers, assistants and

25  employees as may be authorized").  With regard to the claim that Chief Gascón wrongfully

26  failed to modify the stay-away order when he (Schiff) requested it, Schiff contends that

27

28  WL 1773130 (N.D. Cal., June 22, 2009).

13

United States District Court

For the Northern District of California

1   Chief Gascón indicated in his deposition testimony that he was the final policymaker.

2          Third, the City argues that Schiff cannot show that any individual with final

3   policymaking authority delegated that authority to a subordinate or "ratified" the actions

4   about which he complains.  In response, Schiff  contends that by using Captain Barrett's

5   "lies and perjured testimony" before the Police Commission to support the disciplinary case

6   against him, the City and the Police Commission "ratified" Captain Barrett's conduct and

7   "made it their own" with their "policy of inaction."  He asserts that he obtained Captain

8   Barrett's phone records, and they do not show that she made any phone calls to him the

9   weekend of the Yoakum incident, as she had claimed.

10          Schiff also claims that he made a complaint to the SFPD's Internal Affairs

11   department about Captain Barrett's "misconduct" and argues that it is clear that the SFPD

12   was "completely uninterested" in any evidence that he had that Captain Barrett lied at the

13   Chief's hearing and perjured herself before the Police Commission.

14          The court finds that the motion must be GRANTED as to the claims against the City.

15   First, Schiff has provided no evidence showing an explicit policy or a long-standing custom

16   or practice of discrimination against non-black officers.  Evidence regarding the City's

17   practices during the time of the Officers for Justice consent decree are not at issue in this

18   case.  Moreover, those practices were monitored and approved by the District Court.  Thus,

19   even were it relevant, Schiff cannot show an unconstitutional practice or policy during that

20   time period.

21          Schiff also contends that the promotions resulting from "banding" were the "genesis"

22   of the Schiff I case.  However, in exchange for agreeing to the settlement of the Schiff

23   I case, Schiff released all claims that pre-dated the May 2006 settlement, including any

24   claims relating to the use of "banding" prior to the date of the settlement.

25          To the extent that Schiff is complaining that he was passed over on the 2005

26   Lieutenant eligible list for two black Sergeants who were in his view objectively less

27   qualified, the court notes that the promotions from the 2005 list are the subject of the

28   complaint in Schiff II, and are not part of the present case (although the court also notes

**United States District Court**

For the Northern District of California

1    that of a total of 42 candidates promoted off the 2005 list, only two were black, and 30 were

2    white (some of whom scored lower than Schiff on the examination).  Finally, with regard to

3    any claims concerning "banding" subsequent to the 2005 Lieutenant eligible list, the court

4    notes that the certification rule for the 2009 list did not include banding.

5        As for the stay-away order, it is not a "policy" for purposed of <u>Monell</u> liability, and

6    Schiff has identified no official policy, or long-standing City custom or practice, relating to

7    the issuance of stay-away orders.  Only deprivations occurring pursuant to municipal

8    custom or policy can lead to municipal liability.  <u>See</u> <u>Oviatt v. Pearce</u>, 954 F.2d 1470, 1476-

9    77 (9th Cir. 1992).

10       Second, Schiff has not shown that Chief Gascón or Captain Barrett have final

11   policymaking authority with regard to promotions.  Municipal liability "attaches only where

12   the decision maker possesses final authority to establish municipal policy with respect to

13   the action ordered."  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986).  Making a

14   promotion is not a final policy decision, but rather is an exercise of discretion vested in an

15   appointing officer.  <u>See</u> <u>Texas Dep't of Cmty Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981).

16       Whether a particular official has final policymaking authority is a question of state

17   law.  <u>McMillian v. Monroe County</u>, 520 U.S. 781, 786 (1997); <u>see also</u> <u>Cortez v. County of</u>

18   <u>Los Angeles</u>, 294 F.3d 1186, 1189 (9th Cir. 2001); <u>Federation of African Am. Contrs.</u>, 96

19   F.3d at 1235.  The fact that a city employee has independent decision-making power does

20   not render him a final policymaker for purposes of municipal liability.  "If the mere exercise

21   of discretion by an employee could give rise to a constitutional violation, the result would be

22   indistinguishable from respondeat superior liability."  <u>City of St. Louis v. Prapotnik</u>, 485 U.S.

23   112, 126 (1988); <u>Pembaur</u>, 475 U.S. at 484 n.12.

24       Under the California Constitution, charter cities are specifically provided the authority

25   to constitute, regulate, and govern city police departments.  <u>Brown v. City of Berkeley</u>, 57

26   Cal. App. 3d 223, 236 (1976).  Government Code § 38630(a) – providing that the police

27   department of a city is under the control of the chief of police – does not apply to charter

28   cities, but only to general law cities.  <u>Id.</u>  San Francisco is a charter city and county under

United States District Court

For the Northern District of California

1   the California Constitution and laws of the State of California.  See Cal. Const. Art. XI, §

2   5(a); S.F. Charter Preamble; Perry v. Schwarzenegger, 704 F.Supp. 2d 921, 953 (N.D. Cal.

3   2010); Cypress Sec. LLC v. City and County of San Francisco, 184 Cal. App. 4th 1003,

4   1011 (2010).

5          The Charter of the City and County of San Francisco makes clear that the San

6   Francisco CSC  is the final policymaker with respect to employment matters.  See Hyland

7   v. Wonder, 117 F.3d 405, 414 (9th Cir. 1997) ("under California law, a city's Charter

8   determines municipal affairs such as personnel matters").  Pursuant to the City Charter, the

9   CSC "is charged with the duty of providing qualified persons for appointment to the service

10   of the City and County."  S.F. Charter § 10.100.  Further, it is the responsibility of the CSC

11   to adopt "rules, policies and procedures" to govern an exhaustive list of topics relating to

12   city employment.  S.F. Charter § 10.101.

13          Under the City Charter, "[w]henever a position controlled by the civil service

14   provisions of this Charter is to be filled, the appointing officer shall make a requisition to the

15   department of human resources for a person to fill it" and the department "shall certify to

16   the appointing officer the names and addresses of all those persons meeting the

17   certification rule."  S.F. Charter, Appendix A, § A8.329.  Further, "[t]he Civil Service

18   Commission shall establish certification rules" which "shall not be more restrictive than the

19   certification of all candidates receiving the three highest scores on the list of eligibles for

20   each position."  The appointing officer "shall fill the position by the appointment of one of

21   the persons certified."  Id.

22          The CSC has exercised this grant of power by adopting numerous rules on an

23   exhaustive list of employment issues including, but not limited to, appointment to civil

24   service positions, equal opportunity, employer-employee relations, layoff, and separation.

25   See, e.g., S.F. Civ. Serv. Comm'n Rules 103, 110, 114, 121, 122.13.   As the final

26   policymaker for personnel matters, the CSC is free to delegate broad operational authority

27   to a municipal department – including authority over personnel policy – without turning that

28   department into a "final policymaker" for purposes of municipal liability.  Prapotnik, 485 U.S.

United States District Court

For the Northern District of California

1  at 127-28.

2      Where, as here, an appointing officer has the authority to hire and fire workers, but

3  not the responsibility for establishing employment policy, the personnel decisions of the

4  appointing officer cannot be attributed to the municipality.  See Pembaur, 475 U.S. at 483

5  n.12.  Thus, neither Chief Gascón nor Captain Barrett had final policymaking authority with

6  regard to promotions.

7       As for the stay-away order, it was not drafted or issued by Chief Gascón.  Rather,

8  he simply refused to agree to Schiff's request that it be modified (a mere month after Schiff

9  had been disciplined for failing to make a report regarding a threat to that very same family

10  that he was ordered to stay away from).  Moreover, Schiff has not established that either

11  the issuance of the stay-away order or the denial of his request to modify the stay-away

12  order infringed his constitutional rights.

13      Finally, Schiff has not established that any individual with final policymaking authority

14  delegated that authority to a subordinate, or ratified a subordinate's unlawful decision or

15  action.  In determining whether policymaking authority has been delegated to a municipal

16  official, "courts consider whether the official's discretionary decision is constrained by

17  policies not of that official's making and whether the official's decision is subject to review

18  by the municipality's authorized policymakers."  Christie v. Iopa, 176 F.3d 1231, 1236-37

19  (9th Cir. 1999) (citation and quotation omitted).  "[D]elegating discretion is not equivalent to

20  delegating final policymaking authority."  See id. at 1238; see also Webb v. Sloan, 330 F.3d

21  1158, 1165-66 (9th Cir. 2003).  Schiff has made no showing that the CSC delegated final

22  policymaking authority to any individual, or ratified a subordinate's unlawful decision or

23  action.

24      Moreover, "ratification requires . . . knowledge of the alleged constitutional violation."

25  Iopa, 176 F.3d at 1239.  A policymaker's knowledge of an unconstitutional act does not, by

26  itself, constitute ratification.  Id.  Rather, a plaintiff must prove that "the authorized

27  policymakers approved a subordinate's decision and the basis for it."  Praprotnik, 485 U.S.

28  at 127.  A policymaker's mere refusal to overrule a subordinate's completed act does not

United States District Court

For the Northern District of California

1   constitute ratification.  Iopa, 176 F.3d at 1239 (citing Weisbuch v. County of Los Angeles,

2   119 F.3d 778, 781 (9th Cir. 1997) (to hold cities liable whenever policymakers fail to

3   overrule the unconstitutional discretionary acts of subordinates "would simply smuggle

4   respondeat superior liability into Section 1983") (citation and quotation omitted)).

5        Schiff claims that his counsel complained at the Police Commission hearing that

6   Captain Barrett was lying about whether she called Park Station on a certain date and

7   whether she ordered that "passing calls" be made past the Yoakum residence.  However,

8   the evidence that he provides to support that assertion consists of a 92-page transcript of

9   the November 4, 2009 Police Commission hearing, with no indication as to where in the

10  transcript the alleged argument might be found.

11       Moreover, Schiff fails to link any action by the Police Commission to his race (for the

12  discrimination claim) or his filing of the prior lawsuit (for the retaliation claim).  Nor is there

13  any evidence that the Police Commission was aware of the fact that Schiff was eligible for

14  promotion at the time of the discipline.  Schiff has failed to establish that the Police

15  Commission disciplined him for deliberate or known unlawful reasons.

16       With regard to Schiff's claim that his memo to Commander Murphy in the Internal

17  Affairs department, reporting Captain Barrett's alleged inconsistencies in her testimony, is

18  evidence of "wrongful conduct," the evidence shows that the Internal Affairs department

19  investigated Schiff's complaints about Captain Barrett, and found no evidence of

20  misconduct.  Nor, is there any evidence that the Police Commission knew about this memo

21  or its contents.  In addition, Schiff fails to explain how Captain Barrett's alleged lying

22  amounts to a constitutional violation.  That is, he has failed to link this action to his race or

23  his prior protected activity.

24       Finally, Schiff has provided no evidence to support his claim of a "policy of inaction."

25  The fact that he does not agree with the outcome of the investigation is not evidence of a

26  policy of inaction.  Whether Captain Barrett actually called Park Station when she said she

27  did, or whether she generated a "passing call" sheet on a certain date, is not relevant to the

28  issue for which Schiff was disciplined.  There was no dispute that Schiff failed to take

United States District Court

For the Northern District of California

1   appropriate action (filing a report) when notified of a threat to a citizen.  He was disciplined

2   for his conduct, and none of his arguments rebut the admitted fact that he failed to follow

3   SFPD General Orders, and was disciplined accordingly.

4        In short, Schiff has provided no admissible relevant evidence showing a custom or

5   practice of discriminating against white police officers.  His argument regarding the

6   historical use of "banding" has no applicability to the present case, as banding was not

7   even part of the certification rule used to establish the 2009 Lieutenant's List.

8        Finally, there can be no <u>Monell</u> claim if the plaintiff has not established a

9   constitutional violation by an individual defendant.  A city or county cannot be liable for

10  damages based on the actions of one of its employees unless the employee inflicted

11  constitutional harm.  <u>See</u> <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986).  Thus, a

12  plaintiff in a § 1983 case must provide evidence of a policy that resulted in the deprivation

13  of the plaintiff's civil rights, and must show that an individual officer, acting pursuant to that

14  policy, inflicted constitutional harm on the plaintiff.  <u>Quintanilla v. City of Downey</u>, 84 F.3d

15  353, 355 (9th Cir. 1996).  As explained below, Schiff has failed to do that.

16        2.      Discrimination claims

17       The City asserts that both of Schiff's discrimination claims fail because he has no

18  evidence of racial discrimination.  When analyzing claims of disparate treatment in

19  employment under § 1981 or § 1983, a district court is guided by Title VII analysis.  <u>Surrell</u>

20  <u>v. California Water Serv. Co.</u>, 518 F.3d 1097, 1103, (9th Cir. 2008); <u>Mustafa v. Clark</u>

21  <u>County Sch. Dist.</u>, 157 F.3d 1169, 1180 (9th Cir. 1998); <u>see also</u> <u>Manatt v. Bank of</u>

22  <u>America</u>, 339 F.3d 972, 979 (9th Cir. 2003) (federal courts apply the same standards in

23  § 1981 and § 1983 actions as they do in Title VII race discrimination cases).

24       In responding to a motion for summary judgment on claims under Title VII, a plaintiff

25  may proceed by using the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>,

26  411 U.S. 792 (1973), or by "simply produc[ing] direct or circumstantial evidence

27  demonstrating that a discriminatory reason more likely than not motivated the employer."

28  <u>Metoyer v. Chassman</u>, 504 F.3d 919, 931 (9th Cir. 2007).  The City argues that Schiff has

no direct evidence of discrimination, and cannot satisfy his burden under the McDonnell Douglas test.

In response, Schiff contends that he can show a genuine issue of material fact as to race discrimination, both directly and under the McDonnell Douglas test.  First, Schiff asserts that direct evidence of discriminatory intent includes the fact that the City initially began its banding scheme "as a means of complying with [the] consent decree" approved by the district court in March 1979.  Schiff notes that in Officers for Justice, the Ninth Circuit found that "the consent decree itself provided a proper rationale for race conscious promotions and serves as a valid defense against the Union's reverse discrimination arguments."  Officers for Justice, 979 F.2d at 727.

However, Schiff asserts, while the consent decree ended in 1998, the City's practice of banding continued through the 2005-2008 selection process, which ended on October 2, 2008.  He argues that because of the termination of the consent decree, the City "long ago lost a proper rationale for race-conscious promotions made under its banding scheme."  He bases his assertion that banding is a "race-conscious scheme" on the statement in the July 2004 announcement for the Q-60 Lieutenant promotional examination that the certification rule for the examination would be the Rule of Three Scores, unless the City's Human Resources Department determined that there would be an adverse impact under Title VII resulting from the examination.

Schiff also contends that the City's internal documents demonstrate "the reasons for banding the lieutenant's examination results."  He claims that banding is the tool the City used to discriminate by "artificially enlarging the pool of minority applicants so that more will be selected."  He refers specifically to a 32-page "Job Analysis" prepared by the City in April 2008 for the position of Lieutenant, which he claims demonstrates that a "hypothetical" band of 43 points "allows the City to have a black selection rate of 45% when the pool of eligible blacks is only 18%" – or, conversely, that "the pool of white applicants (which is 39%) shrinks to a selection rate of 26.2%."  However, this referenced "Job Analysis" is a 32-page document, and Schiff does not explain which part supports his argument, or what

United States District Court

For the Northern District of California

1    the job analysis even means or why it was created by the City.

2          Second, Schiff contends that he can also satisfy his burden under the <u>McDonnell</u>

3    <u>Douglas</u> test.  Under that analysis, a plaintiff must first establish a prima facie case of

4    employment discrimination.  <u>Noyes v. Kelly Servs.</u>, 488 F.3d 1163, 1168 (9th Cir. 2007).  If

5    he does so, the burden shifts to defendants to articulate a legitimate, non-discriminatory

6    reason for its employment decision.  <u>Id.</u>; <u>Surrell</u>, 518 F.3d at 1106.

7          Once that burden is met, the inference of discrimination or retaliation raised by the

8    prima facie case is dispelled.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510-11 (1993).

9    The plaintiff must then provide evidence showing that the asserted reason was a pretext for

10   unlawful discrimination or retaliation.  <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S.

11   133, 146-50 (2000).  At all times, the plaintiff bears the "ultimate burden" of persuasion.

12   <u>See</u> <u>Burdine</u>, 450 U.S. at 256.

13         The City contends that Schiff's claims fail because he cannot establish a prima facie

14   case of discrimination, and because the City has legitimate nondiscriminatory reasons for

15   its decisions, against which Schiff has no evidence of pretext.

16         A plaintiff may establish a prima facie case of disparate treatment by showing that

17   he is a member of a protected class; that he was qualified for his position and performing

18   his job satisfactorily; that he experienced an adverse employment action; and that "similarly

19   situated individuals outside [his] protected class were treated more favorably, or other

20   circumstances surrounding the adverse employment action give rise to an inference of

21   discrimination."  <u>Peterson v. Hewlett-Packard Co.</u>, 358 F.3d 599, 603 (9th Cir. 2004); <u>see</u>

22   <u>also</u> <u>Fonseca v. Sysco Food Servs. of Ariz. Inc.</u>, 374 F.3d 840, 847 (9th Cir. 2004).

23         Schiff contends that he meets the prima facie case because he is white, he took the

24   exam for Lieutenant and was placed on the eligible list, and he was not promoted.  He

25   claims that a black employee (who admittedly scored higher than Schiff did) was promoted,

26   despite the fact that he had two DUI convictions.  In support of this claim, he cites to a

27   paragraph from his own declaration, which simply repeats the assertion in the opposition

28   brief.  However, he provides no evidence showing that this claim is true, showing when the

United States District Court

For the Northern District of California

1    DUI convictions occurred, or showing whether discipline was imposed by the SFPD for

2    these offenses, and if so, when.

3          The City agrees that Schiff is white, and was passed over for promotion, but argues

4    that he cannot show that he was qualified based on a history of no recent discipline

5    (although he was qualified in the sense that he had taken the exam and had a relatively

6    high rank).  In addition, the City asserts, he cannot show that similarly situated officers from

7    outside the protected group were treated more favorably than he was, and cannot show

8    any other fact that would create an inference of discrimination.

9          The City notes that only 6 of the 29 officers promoted from the 2009 Lieutenant

10   eligible list were African-American.  Twelve of the 29 ranked above Schiff on the list, and

11   not one of the 29 had been disciplined for charges related to insubordination, inattention to

12   duty, or failure to report a threat, within the previous eight months.  The two other

13   candidates who were passed over for promotion were the only officers on the list, other

14   than Schiff, who were recently disciplined.  One of those candidates ranked higher than

15   Schiff on the list.  The City asserts that having been disciplined less than eight months

16   earlier, Schiff was not considered qualified for the promotion.  The City argues that these

17   circumstances do not raise an inference of discrimination on the basis of race, and that

18   Schiff therefore fails to meet his prima facie burden.

19         The City asserts further that the SFPD had a legitimate non-discriminatory reason

20   for its actions, and that Schiff has no evidence to show pretext.  The City points to Chief

21   Gascón's testimony, in which he explained that when he evaluated promotional decisions,

22   he considered recent disciplinary actions, and put greater weight on sustained disciplinary

23   complaints concerning matters that reflected poor judgment.  It is undisputed that Schiff

24   received discipline for neglect of duty for failure to report a criminal threat, and that the

25   Police Commission upheld that discipline fewer than eight months before Chief Gascón's

26   July 2010 promotional decision.  Again, in November 2010, Schiff's discipline was less than

27   a year old, and the City asserts that Chief Gascón did not promote him for that reason – as

28   he did not promote any candidate with a disciplinary history within one year of the

22

United States District Court

For the Northern District of California

1   promotional decision.

2        A plaintiff may defeat summary judgment by offering direct or circumstantial

3   evidence "that a discriminatory reason more likely motivated the employer," or "that the

4   employer's proffered explanation is 'unworthy of credence' because it is internally

5   inconsistent or otherwise not believable."  Anthoine v. North Central Counties Consortium,

6   605 F.3d 740, 753 (9th Cir. 2010) (quotation and citation omitted).  That is, Schiff must offer

7   evidence that the City's stated reasons for the alleged adverse action(s) were untrue or

8   pretextual, or evidence that his supervisors acted with a discriminatory animus, or a

9   combination of the two, such that a reasonable trier of fact could conclude that defendants

10  engaged in intentional discrimination.  See Goodwin v. Hunt Wesson, Inc., 150 F.3d 1217,

11  1222 (9th Cir. 1998).

12       Direct evidence includes "clearly sexist, racist, or similarly discriminatory statements

13  or actions by the employer."  Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir.

14  2005).  By contrast, circumstantial evidence is evidence "that tends to show that the

15  employer's proffered motives were not the actual motives because they are inconsistent or

16  otherwise not believable."  Godwin, 150 F.3d at 1222.

17       "These two approaches are not exclusive; a combination of the two kinds of

18  evidence may in some cases serve to establish pretext so as to make summary judgment

19  improper."  Anthoine, 605 F.3d at 753 (quotation and citation omitted).  However, "[a]

20  plaintiff may not defeat a defendant's motion for summary judgment merely by denying the

21  credibility of the defendant's proffered reason for the challenged employment action."

22  Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 n. 6 (9th Cir. 2006).  "When

23  the evidence on which a plaintiff relies is circumstantial, that evidence must be specific and

24  substantial to defeat the employer's motion for summary judgment.  Anthoine, 605 F.3d at

25  753 (quotation and citations omitted).

26       Schiff does not argue that any act by Chief Gascón was discriminatory, and the City

27  contends that it has established that the discipline Schiff received in December 2009, as

28  well as the 2008 stay-away order, were issued for legitimate non-discriminatory reasons.

United States District Court

For the Northern District of California

1    Schiff claims that direct evidence of discriminatory intent includes the fact that the City

2    began the use of banding as a method of complying with the consent decree, and that the

3    City "manipulated" exam scores to benefit minority candidates, and that even after the

4    consent decree had terminated, the City continued the use of banding in the certification

5    rule for the 2005 Lieutenant promotional examination.  However, he provides no direct

6    evidence of discriminatory intent that is relevant to the present action.

7        Schiff also points to the testimony of Chief Gascón, who described his general

8    practice regarding making promotions – that he would not promote someone who was the

9    subject of a disciplinary action within a year of the promotional decision – but in the case of

10   Schiff, testified that he could not specifically recall why he had not promoted him.  Schiff

11   claims that the articulated reason itself is sufficiently pretextual for the matter to be

12   submitted to a jury.

13       Schiff argues that pretext is also shown by the fact that banding was "historically"

14   used to increase the pool of available black candidates, and by the statistical evidence of

15   the promotions off the 2000 list and the Department's history of manipulating exam results.

16   Further, Schiff argues, the fact that the Department selected a black Sergeant who had a

17   history of DUI convictions for promotions, while citing Schiff's "relatively minor" discipline

18   over the Yoakum matter, shows that the City is continuing to discriminate against white

19   men.

20       Finally, Schiff claims that the discipline imposed on him is not a "legitimate, non-

21   discriminatory reason" for not promoting him, because the discipline itself was motivated by

22   an intent to retaliate, and because the City at the same time showed it was completely

23   uninterested in disciplining Captain Barrett for failing to take proper action to protect Ms.

24   Yoakum.

25       The court finds that the motion must be GRANTED.  First, Schiff fails to provide

26   direct evidence of discrimination.  He cites to no explicitly racist or discriminatory

27   statements or actions by the City or his supervisors, and relies instead on the fact that

28   "banding" existed as a certification rule for the 2005 list, and on a document Schiff calls "the

24

United States District Court

For the Northern District of California

1   City's April 2008 Job Analysis."  However, Schiff has presented no evidence that the

2   certification rule that is at issue in this case was discriminatory.

3          Moreover, to the extent that Schiff is attempting to argue that the City's adoption of

4   banding was a discriminatory act, that claim is untimely, as the certification rule was

5   adopted more than three years before Schiff filed the present action, and is also barred by

6   the March 2006 settlement and release.  As for the promotions from the 2009 Lieutenant

7   eligible list (the subject of the present action), the evidence shows that banding was not

8   used as part of the certification rule, and Schiff provides no evidence to support his claim

9   that the examination scores in the exam that resulted in the 2009 list were "manipulated" to

10  benefit black candidates.

11         Second, Schiff fails to meet his burden under the McDonnell Douglas test, because

12  he fails to show any link between his race and the conduct at issue.  Even if the court

13  assumes for the sake of argument that Schiff meets the prima facie case, he has provided

14  no direct or circumstantial evidence showing that a discriminatory reason more likely

15  motivated the City, or that the City's proffered explanation is unworthy of credence because

16  it is internally inconsistent or otherwise not believable.  See Anthoine, 605 F.3d at 753.

17         With regard to the claim that evidence of pretext arises from the fact that a black

18  employee was promoted over him, despite two DUI convictions and "a serious disciplinary

19  history," Schiff presents no evidence of this employee's disciplinary history or his DUI

20  convictions.  In addition, even if this claim were true, Schiff has provided no evidence that

21  the discipline occurred sufficiently recently in time (within a year or two) to have been

22  considered by Chief Gascón.  Schiff also concedes that this black employee scored higher

23  in the rankings than he did.

24         With regard to the argument that the reason for his non-promotion could not have

25  been his recent discipline, because Chief Gascón testified in his deposition that he could

26  not specifically recall as to Schiff personally, why he was not promoted, the court notes that

27  Chief Gascón also testified that recent discipline prevented the promotion of all three

28  candidates (including Schiff) who were not promoted from the 2009 list under his tenure,

United States District Court

For the Northern District of California

1   and that he also testified that he looks more closely at sustained complaints that deal with

2   poor judgment.  There is no dispute that Schiff had been the subject of recent discipline,

3   given that the final decision of the Police Commission and Chief Gascón's order were not

4   issued until December 2009.

5        With regard to the assertion that "statistical evidence of promotions off the 2000 List"

6   are evidence of discriminatory intent, Schiff fails to cite to any of this supposed statistical

7   evidence, or to any evidence that would support this claim.  Moreover, none of the

8   promotions from the 2000 List included any black candidates, which precludes the

9   argument that black candidates are always promoted.  Further, Schiff provides no

10  explanation as to how promotions from the 2000 list had any impact on the promotional

11  decisions at issue here (promotions from the 2009 list).

12       With regard to the claim that his discipline cannot be considered a legitimate reason

13  for failing to promote him if the discipline was motivated by a desire to retaliate, the court

14  notes that Schiff has provided no evidence that his discipline was linked in any way to his

15  prior lawsuit, or to his race; has provided no evidence that Chief Gascón or the members of

16  the Police Commission were aware of his prior lawsuit; or, apart from his own unsupported

17  assertions, any evidence that Captain Barrett was motivated by discriminatory or retaliatory

18  intent, that Chief Fong assigned Captain Barrett to Park Station for retaliatory or

19  discriminatory motives, or that Chief Fong and Captain Barrett were in cahoots to bring him

20  down.

21       Finally, with regard to the claim that the City's alleged disinterest in taking

22  disciplinary action against Captain Barrett (based on Schiff's allegations of misconduct) is

23  evidence of pretext, the evidence shows that SFPD Internal Affairs investigated all of

24  Schiff's complaints and determined that there was insufficient evidence to sustain the

25  complaints against Captain Barrett, though they did find sufficient evidence to sustain

26  Schiff's complaints against another officer.

27       In short, none of Schiff's arguments regarding pretext present either direct evidence

28  (clearly racist or other discriminatory statements or actions), or specific and substantial

United States District Court

For the Northern District of California

1    circumstantial evidence that is sufficient to raise a triable issue and to defeat the City's

2    motion for summary judgment.  There is no dispute that Schiff violated Department rules by

3    failing to report the threat to the Yoakum family, and it was that incident that formed the

4    basis of the discipline.

5        3.    Retaliation claim

6        The City argues that Schiff's § 1981 retaliation claim fails because he fails to

7    establish a prima facie case retaliation, and fails to show that the City's articulated reasons

8    for its decisions were pretextual.

9        Section 1981 does not include an express retaliation provision, but federal courts

10   have found that § 1981 encompasses retaliation claims.  See, e.g., Manatt, 339 F.3d at

11   795.  Section 1981 retaliation claims are analyzed under the framework of a claim for

12   retaliation under Title VII.  Id. at 801.  That is, a plaintiff alleging retaliation under § 1981

13   may either proceed by producing direct or circumstantial evidence showing that a

14   discriminatory reason more likely than not motivated the employer, or may apply the

15   McDonnell Douglas burden-shifting framework.  Surrell, 518 F.3d at 1105; see also Davis v.

16   Team Elec. Co., 520 F.3d 1080, 1088-89 (9th Cir. 2008).

17       To make out a prima facie case of retaliation, an employee must show that he

18   engaged in a protected activity; that his employer subjected him to an adverse employment

19   action; and that a causal link exists between the protected activity and the adverse action.

20   Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000).  Once the prima facie case is

21   established, the burden shifts to the defendant to set forth a legitimate, non-retaliatory

22   reason for its actions; at that point, the plaintiff must produce evidence to show that the

23   stated reasons were a pretext for retaliation.  Bergene v. Salt River Project Agric.

24   Improvement & Power Dist., 272 F.3d 1136, 1140-41 (9th Cir. 2001).

25       The City appears to concede that Schiff engaged in protected activity (filing the

26   Schiff I lawsuit in 2003 and the Schiff II lawsuit in 2008) and that he suffered an adverse

27   action (wasn't promoted).  However, the City argues that Schiff cannot establish a prima

28   facie case of retaliation because he cannot show a causal link between his participation in a

1    protected activity and the alleged adverse employment actions.

2        A causal link can be established by "an inference derived from circumstantial

3    evidence." Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1075 (9th Cir. 2003)

4    (quotation and citation omitted).  An example of such circumstantial evidence would be

5    evidence that the employer knew that the employee had engaged in protected activities,

6    and the proximity in time between the protected action and the alleged retaliatory

7    employment action.  Jordan v. Clark, 847 F.2d 1368, 1376 (9th Cir. 1988); see also Yartzoff

8    v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

9        With regard to the causal link between the protected activity and the alleged adverse

10   action, Schiff points to the fact that he has a 23-year history of work with the SFPD, with no

11   serious discipline (before the Yoakum incident), and to the fact that Captain Barrett made

12   five disciplinary charges against him, four of which were later found to be unfounded.

13   Schiff claims that these facts are sufficient to support a finding of retaliatory intent.

14       The City also contends that it had legitimate, non-discriminatory reasons for the

15   actions Schiff challenges.  Since the claims for retaliation encompass the same adverse

16   actions as the discrimination claims, the City argues that Schiff cannot rebut its articulated

17   non-discriminatory reasons, for the same reason as in the discussion of the discrimination

18   claims.

19       Schiff must show that the articulated reasons are pretextual either directly by

20   showing that a discriminatory reason more likely motivated the City, or indirectly by

21   showing that the City's proffered explanation is unworthy of credence.  E.E.O.C. v. Boeing

22   Co., 577 F.3d 1044, 1049 (9th Cir. 2009) (quoting Burdine, 450 U.S. at 256).  A proffered

23   explanation is "unworthy of credence" if it is "internally inconsistent or otherwise not

24   believable."  Chuang v. University of Cal., Davis, Bd. of Trustees, 225 F.3d 1115, 1127 (9th

25   Cir. 2000).  As noted above in the discussion of the discrimination claims, "[w]hen the

26   evidence on which a plaintiff relies is circumstantial, that evidence must be specific and

27   substantial to defeat the employer's motion for summary judgment.  Anthoine, 605 F.3d at

28   753 (quotation and citations omitted).

United States District Court

For the Northern District of California

1    Schiff contends that the City's stated reason for the non-promotions (the imposition

2    of discipline) is a pretext for discrimination, for the same reasons argued above with regard

3    to the discrimination claim.  With regard to Chief Gascón's stated reason for refusing to

4    modify the stay-away order – that not enough time had passed since the adjudication of the

5    discipline, and that the order was not intended to be punitive for Schiff, but rather to protect

6    Ms. Yoakum and her family – Schiff asserts that this is pretextual because "what possible

7    difference did it make that the already-concluded disciplinary process was too recent?"  He

8    claims that the stated reason for continuing the existence of the stay-away order is not

9    logically supported by the reason for Chief Gascón's refusal to modify it.

10   The court finds that the motion must be GRANTED.  Schiff cannot establish a causal

11   connection between his protected activity (the filing of Schiff I in 2003) and the City's failure

12   to promote him from the 2009 List, because of the length of time between the two events.

13   Thus he cannot establish a prima facie case of retaliation.  With regard to Schiff's argument

14   that his 23-year work history with no serious discipline shows a causal link between his

15   prior lawsuits and lack of promotion, and that Captain Barrett's "disciplinary charges"

16   against him create an inference of discrimination, Schiff fails to present any evidence

17   establishing either his lack of prior discipline, or evidence showing that any disciplinary

18   charge was brought against him by Captain Barrett.

19   The disciplinary action resulting from Schiff's failure to report the threats to the

20   Yoakum family was initiated prior to the filing of both Schiff II and Schiff III.  The incident

21   that prompted the disciplinary action occurred on September 20, 2008.  The stay-away

22   order was issued on September 25, 2008, and the disciplinary investigation immediately

23   ensued.  Thus, his only protected activity that predated the initiation of the disciplinary

24   action was the filing of Schiff I.

25   Moreover, it was Chief Gascón who ultimately recommended the disciplinary action,

26   and Schiff has no evidence that Chief Gascón was aware of his prior lawsuits, or his prior

27   complaints of discrimination, at the time he made the disciplinary recommendation.  Schiff's

28   claims that his discipline or failure to be promoted were retaliatory also fail because Chief

United States District Court

For the Northern District of California

1    Gascón promoted two of the Schiff I plaintiffs to the rank of Lieutenant.  This showing that

2    similarly situated employees were treated similarly to Schiff negates any showing of

3    pretext.  See Snead v. Metropolitan Prop. & Cas. Ins. Co., 237 F.3d 1080, 1094 (9th Cir.

4    2001).

5         Nor does Schiff have any evidence that Captain Barrett's alleged retaliatory conduct

6    was causally connected to the filing of his lawsuit in October 2008, or his EEO complaint

7    made in April 2009.  Barrett's concerns regarding Schiff's job performance began at the

8    community meeting in January 2008.  She continued to monitor and document his

9    performance issues throughout 2008 and 2009, during which time there was no increase in

10   any protected activity.  While Captain Barrett reported various incidents involving Schiff to

11   her supervisors, there is no evidence that Schiff was ever disciplined for those incidents.

12   Nor is there any evidence to support Schiff's suggestion that Captain Barrett was basing

13   her retaliatory conduct on input from Chief Fong.

14        There is no dispute that Chief Gascón disciplined Schiff in December 2009 for

15   neglect of duty for failing to take appropriate action after being notified of a threat to a

16   member of the community, and there is also no dispute that Chief Gascón chose not to

17   promote Schiff (as well as two other candidates) on the 2009 List, due to recent disciplinary

18   issues.  Schiff has offered no evidence tying any of this conduct to his prior protected

19   activity, or showing that Chief Gascón or the members of the Police Commission were even

20   aware of the prior lawsuits.  Further, the evidence shows that Captain Barrett had no role in

21   recommending discipline for Schiff.

22        With regard to Schiff's argument concerning Chief Gascón's refusal to modify the

23   stay-away order, the fact that Schiff disbelieves Chief Gascón's explanation is not specific

24   or substantial evidence that can overcome summary judgment.

25        Finally, with regard to Schiff's argument regarding the Police Commission's

26   disciplinary decision, the court notes that Schiff has no viable claim challenging the Police

27   Commission's decision, because he failed to exhaust the remedies available to him.  Thus,

28   any "facts" related to those events are immaterial to challenge his discipline as retaliatory.

United States District Court

For the Northern District of California

1    As with the discrimination claims, Schiff has provided no evidence showing that the

2  City's articulated reason for not promoting him off the 2009 List was a pretext for retaliation.

3  Even if the court assumes for the sake of argument that Schiff has met the prima facie

4  case, summary judgment must still be granted in the City's favor because he has failed to

5  rebut the legitimate, non-retaliatory reasons for the City's actions.

6         4.    Remaining argument

7    Defendants assert that Schiff cannot maintain a § 1981 claim because, as a public

8  employee, his employment is not based on contract.  As summary judgment has been

9  granted as to all claims remaining in the case, the court does not address this argument

10  separately.

11  C.   Schiff's Motion

12    Schiff seeks partial summary judgment.  He seeks a ruling that Captain Barrett lied

13  in her testimony before the Police Commission, and that her false statements caused him

14  to be disciplined by the Police Commission.  He also seeks summary judgment as to all 31

15  of defendants' affirmative defenses, arguing that the City has no evidence to support any of

16  the defenses.

17         1.    Captain Barrett's testimony

18    Schiff seeks a ruling that Captain Barrett lied in her testimony before the Police

19  Commission.  Schiff argues that Captain Barrett told the Police Commission that she left

20  voice-mail messages for him, and that she called Park Station on September 20, 2008, to

21  implement "passing calls" at the Yoakum residence.  Schiff contends that the phone

22  records he obtained in discovery do not support Captain Barrett's claims about these phone

23  calls.  He wants the court to grant summary judgment on these "issues" in his favor.     In

24  response, the City argues that Schiff is improperly seeking to use Rule 56 to decide a

25  question of fact without having brought a proper motion for summary judgment, and that he

26  has no viable claim challenging the Police Commission disciplinary action; that Schiff has

27  not supported his motion with admissible evidence or demonstrated that there is no

28  genuine issue regarding Barrett's conduct, but rather has simply provided phone records

1   without any foundation to support admissibility; and that the evidence does not support the

2   finding Schiff seeks.

3       The court finds that the motion must be DENIED.  The court agrees with the City that

4   Rule 56(g) does not authorize a party to bring an independent motion to establish certain

5   facts as true.  The Advisory Committee Notes state that subdivision (g) becomes relevant

6   "only after the court has applied the summary- judgment standard carried forward in

7   subdivision (a) to each claim or defense, or part of a claim or defense, identified by the

8   motion." F.R.C.P. 56, 2010 Advisory Committee Notes.

9       More importantly, Schiff has not established that the factual "finding" he seeks is

10  material to the claims that remain in this case.  In his notice of motion, he asserts that

11  Captain Barrett's false statements caused him to be disciplined by the Police Commission.

12  In his argument, he makes no connection between the alleged false statements and the

13  Commission's decision to uphold the imposition of discipline.  He does argue in the reply

14  that the alleged false statements are material, though he does not identify a particular

15  claim.

16      He seems to be arguing that Captain Barrett was the motivating force behind the

17  discipline.  However, the evidence shows that Captain Barrett did not investigate the

18  incident, or impose the discipline.  Moreover, the discipline was imposed on Schiff for his

19  failure to report the threat to Ms. Yoakum, which violated Rules 2, 5, and 26 of Department

20  General Order 2.01 (as set forth above).  Whether Captain Barrett did or did not call him

21  when she said she did, and whether she did or did not order "passing calls" when she said

22  she did, is not relevant to the fact that Schiff violated Department rules by failing to report

23  the threat.

24      Since the Police Commission hearing occurred before the promotional decisions,

25  and since Captain Barrett was not in any event involved in making the promotional

26  decisions, her statements at the Commission hearing regarding her actions cannot be used

27  as evidence that Chief Gascón's articulated reasons for not promoting Schiff (the imposition

28  of discipline for Schiff's actions) were a pretext for retaliation or discrimination.  Thus, the

United States District Court

For the Northern District of California

1  question whether Captain Barrett did or did not make false statements before the

2  Commission is irrelevant to the claims in this case.

3          2.      The City's affirmative defenses

4          Schiff seeks summary judgment as to all 31 of the City's affirmative defenses,

5  arguing that the City has no evidence to support any of them.  The motion is DENIED.

6  First, on the merits, Schiff has not "identif[ied] each claim or defense – or the part of each

7  claim or defense – as to which summary judgment is sought," as required by Rule 56(a).

8  Instead, he simply offers a broad challenge to all the affirmative defenses, whether factual

9  or legal, and offers no discussion about the alleged lack of evidence that warrants judgment

10  in his favor.

11         While the City has effectively conceded that eight of its affirmative defenses are not

12  applicable in this case, Schiff is not entitled to summary judgment without making some

13  showing as to which defenses the court should dismiss, and why.  The court cannot be

14  expected to review all the affirmative defenses, consider what evidence might or might not

15  be required, review all the City's responses to Schiff's interrogatories, and then make a

16  determination as to whether the City does or does not have sufficient evidence to support

17  those defenses.

18         Moreover, in view of the court's granting of summary judgment in the City's favor,

19  any motion by Schiff regarding the affirmative defenses has become moot.

20                                    **CONCLUSION**

21         In accordance with the foregoing, the City's motion for summary judgment is

22  GRANTED, and Schiff's motion for summary judgment is DENIED.

23

24  **IT IS SO ORDERED.**

25  Dated: September 8, 2011

26  _____
    PHYLLIS J. HAMILTON
    United States District Judge

27

28